1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7   SHARLA DAWN ECKERT,

Plaintiff,

Case No. 15-cv-04461-JCS

8
v.

9
CAROLYN W. COLVIN,

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

10
Defendant.

Re: Dkt. No. 14

11
12   **I.      INTRODUCTION**

13         Plaintiff Sharla Eckert seeks review of the final decision of Defendant Carolyn Colvin,

14   Commissioner of the Social Security Administration (the "Commissioner"), denying her

15   applications for disability insurance and Supplemental Security Income benefits under Titles II

16   and XVI of the Social Security Act.  For the reasons stated below, the Court GRANTS Eckert's

17   Motion for Summary Judgment, DENIES the Commissioner's Cross-Motion for Summary

18   Judgment, and REMANDS the case to the Commissioner for the calculation and award of

19   benefits.[1]

20   **II.     BACKGROUND**

21         **A.      Eckert's Personal and Medical History**

22         Eckert was born on March 10, 1979.  Administrative Record ("AR," dkt. no. 12) at 402.

23   She is a high school graduate who has completed educational training to work as a doctor's

24   assistant.  *Id.* at 112–13, 330.  From 1995 to 2011, Eckert held various jobs in retail, child care,

25   and job staffing services.  *See* AR 318–23, 330.  On May 11, 2011, the alleged onset date of her

26   disability, Eckert was 32 years old and working as a doctor's assistant at an optometrist's office.

27
28   _____

[1] The parties have consented to the jurisdiction of the undersigned magistrate for all purposes
pursuant to 28 U.S.C. § 636(c).

*See id.* at 107, 330, 402.

Eckert has alleged that she suffers from chronic osteoarthritis, degenerative disc disease, bone spurs, compression fractures, severe back and hip pain, diabetes, insulin resistance, obesity, depression, and anxiety. *See id.* at 274, 276. Additionally, the record suggests that she has suffered from sleep apnea, hypertension, hyperlipidemia, gastroesophageal reflux disease, and obsessive compulsive disorder. *See id.* at 402, 421, 495. Eckert also underwent hand surgery for carpal tunnel syndrome in 2008 and wrist surgery for de Quervain's syndrome in 2010. *See id.* at 588. Eckert has further testified to suffering from attention deficit hyperactivity disorder since childhood. *See id.* at 105.

Treatment records list several medications that she has taken to treat her physical and mental health conditions. *See, e.g., id.* at 422–23, 585–86, 674. Those records generally indicate that Eckert is allergic to codeine and Vicodin, both of which cause her to experience an itching reaction. *See, e.g., id.* at 423, 452–53, 572, 585. A few records also note that codeine, Vicodin, and other medications make Eckert feel nauseous and experience anxiety. *See id.* at 482, 588, 600, 702, 709.

The record includes notes from Eckert's medical treatment starting in June 2010 when Dr. Hoda Ghanem evaluated Eckert's diabetes. *See id.* at 402. At that evaluation, Dr. Ghanem noted that Eckert was taking her medication and "doing quite well." *Id.* Dr. Ghanem also observed that Eckert had not been experiencing hyperglycemic or hypoglycemic episodes, but had become "tired of the diet and started eating worse." *Id.* Dr. Ghanem recorded that Eckert knew her poor eating habits were affecting her blood sugar. *Id.* Dr. Ghanem also noted that Eckert had failed to make necessary adjustments to correct her high blood sugar and poor eating habits, and had not been checking her blood sugar as regularly as she had in the past. *Id.* Dr. Ghanem opined that Eckert had neuropathic feet. *Id.* at 403–04. Dr. Ghanem recommended that Eckert use more insulin due to her poor eating habits and consume a "[d]iabetic low fat, low salt diet with weight loss and exercise." *Id.* Eckert, who is 5 feet 6 inches tall, weighed 254 pounds at the time of Dr. Ghanem's evaluation. *Id.* at 403.

On August 6, 2010, Eckert saw Dr. Maliha Qadir for leg swelling. *Id.* at 511–12. Dr.

Qadir served as Eckert's primary care doctor through 2013, seeing Eckert frequently for symptoms related to coughing, fatigue, sleep apnea, back pain, diabetes, and obesity.  *See*, *e.g.*, *id.* at 458, 478, 484, 487, 490, 497.  Dr. Qadir's evaluations of Eckert frequently yielded some normal results and she often noted improvements in Eckert's medical conditions.  For example, Dr. Qadir's treatment notes repeatedly describe Eckert as being "well nourished, well developed and hydrated," having normal respiratory function with clear lungs and no chest pain, lacking any neurological deficits, testing negative for fatigue and fever, and showing no psychiatric symptoms. *See*, *e.g.*, *id.* at 423, 426, 429, 432.  Dr. Qadir's evaluations also show that Eckert's asthma and sleep apnea symptoms improved after treatment.  *See id.* at 430.  However, while under Dr. Qadir's care, Eckert suffered from several other health problems, she became increasingly insulin resistant, and her weight steadily rose.  During the August 6, 2010, appointment, Eckert's weight was recorded at 268 pounds.  *See id.* at 511.

On September 2, 2010, Dr. Qadir met with Eckert for a "weight management check." *Id.* at 508.  Eckert weighed 275 pounds and expressed a desire to have bariatric surgery. *Id.* at 508–09.

Dr. Qadir examined Eckert again in November 2010 for a fever and cough.  *Id.* at 504. Although Eckert's weight had not increased since her last appointment, Dr. Qadir noted that Eckert's insurance company had denied Eckert's request for bariatric surgery.  *Id.* at 506.

On April 29, 2011, Eckert saw Dr. Qadir and complained of abdominal pain and feeling sick.  *Id.* at 475.  Eckert's weight had increased to 296 pounds.  *Id.* at 476.

Eckert saw Dr. Qadir again on May 12, 2011, and complained that she was experiencing abdominal pain on a daily basis.  *Id.* at 469–70.  An ultrasound revealed a gallstone.  *See id.* at 469.  Dr. Qadir referred Eckert to a surgeon and noted that Eckert still wanted bariatric surgery. *Id.* at 470.  Eckert returned to Dr. Qadir on May 18, 2016, and Dr. Qadir noted that Eckert was scheduled for gallstone surgery the following day.  *Id.* at 462.  Dr. Qadir further noted that Eckert wanted "to go on 3-6 months disability" so that she could recover from gallstone surgery, control her diabetes, lose weight, and receive bariatric surgery.  *Id.*

Eckert underwent gallstone surgery on May 19, 2011.  *See id.* at 591.  The anesthesiologist

noted that Eckert was allergic to codeine and Vicodin and limited to narcotic pain medication. *Id.* at 600. The operation was successfully performed, but the surgeon noted that it "was difficult because of the size of the patient." *Id.* at 591.

After the surgery, Dr. Qadir frequently provided treatment to Eckert. *See id.* at 447–61. In June 2011, Dr. Qadir noted that Eckert was feeling anxious as she prepared to travel. *Id.* at 459. Eckert then weighed 298 pounds. *Id.* Dr. Qadir recommended a sleep apnea evaluation and observed that Eckert had suffered from anxiety and depression for several years. *Id.* at 460. Two months later, Dr. Qadir noted that Eckert was experiencing worsening back pain and weighed 313 pounds. *Id.* at 450–51. After conducting a physical examination and finding that Eckert had "[n]ormal musculature, no joint deformities or abnormalities, [and] normal range of motion for all four extremities for age," Dr. Qadir referred Eckert to Dr. Hisako Ohmoto for back-pain treatment and assessment of rheumatic disorders. *Id.* at 452. Dr. Qadir also saw Eckert in September after a sleep study was completed and noted that Eckert had been prescribed a CPAP machine for her sleep apnea. *See id.* at 447–49.

Dr. Ohmoto evaluated Eckert on September 22, 2011, for frequent iritis, a history of lower back pain, and ankylosing spondylitis. *Id.* at 681. Dr. Ohmoto noted the following results of Eckert's musculoskeletal examination: her cervical spine was not tender and had good range of motion; her thoracic spine was not tender; her lumbar spine experienced pain during testing and palpation; her sacroiliac joint was not tender to palpation; her hands had full bilateral grip; and her shoulders, hips, elbows, and wrists had good range of motion. *Id.* at 683. During a second examination on October 3, 2011, Dr. Ohmoto determined that Eckert did not suffer from ankylosing spondylitis and noted that an x-ray of Eckert's lumbar spine showed that she had a bone spur. *Id.* at 679–80. He also opined that Eckert's lower back pain was possibly secondary to early degenerative arthritis or long-term obesity. *Id.*

Eckert had three appointments with Dr. Qadir in October 2011 for asthma-related symptoms. *See id.* at 438–46. During the second appointment, Eckert weighed 325 pounds and Dr. Qadir referred her to pulmonologist Dr. Chirag Pandya. *Id.* at 442–43. At the third appointment, Dr. Qadir noted that Eckert "need[ed] extension of the disability." *Id.* at 438.

Dr. Pandya treated Eckert over four appointments from October to November 2011. *See id.* at 800–13. Dr. Pandya conducted a pneumonia assessment and evaluated Eckert's asthma and sleep apnea symptoms. *See id.* During the second appointment, Dr. Pandya noted that Eckert's asthma symptoms had worsened, were occurring daily, and were mildly severe. *Id.* at 804. Dr. Pandya also noted that Eckert's sleep apnea symptoms had persisted. *Id.* During the fourth appointment, Dr. Pandya observed that Eckert's asthma had improved with therapy and her sleep apnea had improved with new settings and a greater tolerance for the CPAP machine. *Id.* at 800.

Eckert also started receiving treatment from Dr. Allyson Tevrizian in October 2011 for food allergies and asthma. *See id.* at 528. As described below, Dr. Tevrizian's treatment of Eckert continued through April 2012. *See id.* at 691. However, the record does not contain treatment notes for some of those visits.

Eckert saw Dr. Qadir twice in December 2011 for cold symptoms and was diagnosed with a cough, acute bronchitis, and allergic rhinitis. *See id.* at 432, 435. Dr. Qadir also noted that Eckert had been unable to reduce her weight, her diabetes was poorly controlled, and she would see a psychiatrist to address her obesity and endogenous depression. *Id.* at 434, 437.

Dr. Daniel Kostalnick psychiatrically evaluated Eckert in January 2012. *See id.* at 405, 408. Dr. Kostalnick diagnosed Eckert with panic disorder with agoraphobia, attention deficit hyperactivity disorder, generalized anxiety disorder, obsessive compulsive disorder, major depressive disorder, and adjustment disorder with a depressed mood. *Id.* Dr. Kostalnick recommended that Eckert continue taking Zoloft and Klonopin, start taking Cymbalta, and continue attending therapy with another mental-health-treatment provider. *Id.* at 408.

On February 8, 2012, Dr. Qadir observed that several of Eckert's medical conditions had improved, including her symptoms related to asthma, sleep apnea, and anxiety. *Id.* at 430. Dr. Qadir noted that she had discussed pain control options with Eckert for a compression fracture in her spine. *Id.* Dr. Qadir also referred Eckert to orthopedist Dr. Vikram Talwar. *Id.*

A month later, Dr. Qadir discussed Eckert's disability status with her, noting that "she has maxed her short term [*sic*] state disability and now she wants to go for long term [*sic*] permanent

United States District Court
Northern District of California

disability." *Id.* at 425. Dr. Qadir attributed Eckert's back pain to her inability to lose weight and noted that she had not yet received bariatric surgery. *Id.* at 428. Dr. Qadir further opined that Eckert's diabetes and daily consumption of 100 insulin units made it difficult for her to lose weight. *Id.*

On March 13, 2012, Dr. Talwar assessed Eckert's lower back pain. *Id.* at 414. Dr. Talwar noted that Eckert did not "seem to have tenderness to palpation over the lower aspect of her lumbar spine. Motor strength and sensation [were] grossly intact in her bilateral lower extremities as well as deep tendon reflexes. Straight leg raises [caused] stretch pain only." *Id.* at 415. Noting that he had reviewed CT scans of her thoracic and lumbar spines, Dr. Talwar observed that Eckert's lumbar spine concerned him because she had degenerative disc disease and a calcified, bulging disc. *Id.* He also noted that Eckert may have some neural compression. *Id.* Dr. Talwar opined that Eckert should undergo physical therapy and get weight-loss surgery, but he expressed skepticism toward pain management injections "given the distance between her skin and her spine." *Id.*

On August 9, 2012, Dr. Ohmoto saw Eckert for another examination. *Id.* at 727. Dr. Ohmoto noted that Eckert "continues to struggle with chronic pain especially in her lower back. She states that she cannot . . . walk for two minutes because of excruciating pain. She also continues to struggle with knee pain because of obesity." *Id.* Dr. Ohmoto further noted that Eckert's chronic lower back pain was secondary to degenerative changes, that a surgeon had opined that surgery was not warranted, and that medical management of her back pain was recommended. *Id.* at 728. Dr. Ohmoto also observed that Eckert had substantial intolerance to narcotic medications and she was experiencing pain in her wrists and fingers. *Id.*

On September 6, 2012, Eckert saw Dr. Qadir and requested a medication refill. *Id.* at 715. Eckert also informed Dr. Qadir that she would soon take a two-week trip, traveling by airplane. *Id.*

On October 16, 2012, Dr. Ohmoto evaluated Eckert and noted that she was experiencing pain in her hands, wrists, and shoulders. *Id.* at 706–07. Dr. Ohmoto also observed that her lumbar spine had tenderness and limited flexion, her shoulder had full range of motion in spite of her pain,

and her knee had crepitus.  *Id.* at 707.

Eckert visited Dr. Qadir on November 29, 2012.  *Id.* at 711.  Dr. Qadir noted that Eckert, who weighed 335 pounds at the time, had been unable to lose weight.  *Id.*  Dr. Qadir again observed that Eckert was taking high doses of insulin and becoming insulin resistant.  *Id.* at 714.  Dr. Qadir also observed that, to treat her obesity, Eckert needed to see an addiction specialist and receive more psychiatric counseling.  *Id.*  Noting that Eckert could not control her desire to eat large quantities of food and had continued eating fast food, Dr. Qadir suggested that hypnotherapy or a "drastic" measure like "tying the jaw to help her reduce caloric intake" might be necessary.  *Id.*

In summer and fall 2013, Eckert twice received emergency medical treatment.  On June 11, she was treated for hyperglycemia after complaining that her blood sugar had been high due to medical insurance problems that had prevented her from obtaining insulin.  *Id.* at 815, 819.  She received rapid-acting insulin and was discharged that day in "satisfactory" condition.  *Id.* at 822.  On October 4, she returned for emergency care and complained of shortness of breath and heart palpitations.  *Id.* at 848–49.  She was diagnosed with sinus tachycardia, hyperglycemia, and hypertension.  *Id.* at 848–49, 856, 861.  That day, she was treated and discharged in "good" condition.  *Id.* at 857.

**B.    Submissions from Eckert's Doctors to the Social Security Administration**

On September 28, 2012, Dr. Qadir completed a multiple impairment questionnaire and submitted it to the Social Security Administration (the "Administration").  AR at 670–77.  In the questionnaire, Dr. Qadir summarized the treatment she had provided to Eckert and her medical opinions regarding Eckert's health and capacity to work as follows.

Dr. Qadir started treating Eckert in January 2010.  *Id.* at 670.  She had diagnosed Eckert with uncontrolled diabetes, morbid obesity, depression, anxiety, and sleep apnea.  *Id.*  She gave Eckert a "poor" prognosis and explained that "Eckert's blood sugars are out of control.  She is dizzy, weak, suffering from fatigue [and] depression.  She is seeing multiple specialists."  *Id.*  Dr. Qadir listed Eckert's symptoms as severe fatigue, shortness of breath, depression, body pain, back pain, and dizziness.  *Id.*  She described Eckert's pain as constant "[n]europathic pain and back

United States District Court
Northern District of California

7

pain, foot pain from being overweight [and] from her uncontrolled diabetes." *Id.* at 671–72. Dr. Qadir opined that Eckert suffered from constant, moderately severe pain and severe fatigue, and that depression and anxiety contributed to the severity of Eckert's limitations. *Id.* at 672, 675. Opining on Eckert's residual functional capacity ("RFC"), Dr. Qadir stated that Eckert could only sit for two hours and stand or walk for two hours during an eight-hour work day. *Id.* at 672. She opined that Eckert was limited to lifting ten pounds occasionally and carrying five pounds occasionally. *Id.* at 673. She also stated that Eckert had moderate limitations for her fingers, hands, and arms. *Id.* She further opined that Eckert's impairments were ongoing and would last more than 12 months. *Id.* at 675. She explained that Eckert was "[i]ncapable of tolerating even 'low stress'" and would be "unable to concentrate at work. She [could] hardly manage her health issues." *Id.* Responding to the question of whether Eckert's impairments would produce "good days" and "bad days," Dr. Qadir stated that Eckert "ha[d] all 'bad days.'" *Id.* at 676. Dr. Qadir concluded that Eckert "probably need[ed] permanent disability." *Id.*

A week later, Dr. Qadir sent a letter to the Administration. *Id.* at 690. She wrote, "This unfortunate young women [*sic*] suffers from multiple ailments that have been extremely difficult to resolve or get under fair control . . . . Her day is consumed in taking care of her medical issues." *Id.* Dr. Qadir then provided a list of Eckert's medical problems: poorly controlled diabetes mellitus and insulin dependence, hypertension, morbid obesity, major depressive disorder, eating disorder, sleep apnea, fibromyalgia, lower back pain, and osteoarthritis of the knees and back. *Id.* Dr. Qadir further stated that Eckert "continues to work with various specialists to get a handle on her medical problems. At this time she needs to continue to be on disability to take care of her health." *Id.*

Dr. Ohmoto completed an arthritis impairment questionnaire on October 16, 2012, the day that he last examined Eckert, and sent it to the Administration. *See id.* at 698–707. In it, he stated that he treated Eckert twice in 2011 and one other time in 2012. *Id.* at 698. He had diagnosed her with chronic lower back pain secondary to osteoarthritis, knee joint pain secondary to obesity, and joint pain in her hands and wrists. *Id.* He opined that Eckert's prognosis was fair and explained that her pain was not well controlled due to her "intolerance to typical pain medications." *Id.*

Describing his clinical findings, Dr. Ohmoto explained that Eckert had limited range of motion in her lower back, joint tenderness in her wrists and shoulders, crepitus in her knees, and trigger points in her axial muscle group. *Id.* at 698–99. Addressing Eckert's pain, he opined that it was sharp, constant pain in her shoulders and wrists caused by movement, walking, and standing. *Id.* at 701. He also opined that Eckert could initiate ambulation, but could not sustain it or otherwise complete activities. *Id.* at 700. He further opined that Eckert could independently initiate, sustain, and complete fine and gross movements, and had no limitations when using her upper extremities. *Id.* He also opined that Eckert had the RFC to sit for seven hours, stand or walk for up to one hour, lift up to 20 pounds occasionally, and carry up to 10 pounds frequently. *Id.* at 702. He also listed pain and fatigue as symptoms from which Eckert constantly suffered, and estimated that she would need to take unscheduled breaks three or four times each week. *Id.* at 702–04. Dr. Ohmoto stated that he had been unable to relieve Eckert's pain with medication that did not cause unacceptable side effects. *Id.* at 702.

Dr. Tevrizian described her treatment of Eckert in a pulmonary impairment questionnaire that she submitted to the Administration in October 2012. *Id.* at 691–97. Dr. Tevrizian stated that she treated Eckert's asthma from October 2011 to April 2012. *Id.* at 691. She defined her prognosis for Eckert as "[g]uarded." *Id.* at 692. She also listed her clinical findings as shortness of breath, chest tightness, wheezing, episodic acute asthma, fatigue, and coughing. *Id.* She further described some of Eckert's allergies and explained that Eckert experienced intermittent wheezing, pneumonia, and fatigue. *Id.* at 693. She characterized Eckert's asthma attacks as intermittent and severe, and noted the following factors that caused those attacks: upper respiratory infections, allergens, exercise, irritants, gastroesophageal reflux disease, and sleep apnea. *Id.* Dr. Tevrizian estimated that Eckert suffered from multiple asthma attacks each week. *Id.* She further opined that Eckert's respiratory infections could cause Eckert to be incapacitated for up to four weeks. *Id.* Opining on Eckert's RFC, Dr. Tevrizian stated that Eckert was limited to sitting for three hours, standing or walking for two hours, and occasionally lifting and carrying up to five pounds. *Id.* at 694. After listing Eckert's medications, Dr. Tevrizian identified dizziness and nausea as side effects. *Id.* at 695. She also stated that Eckert frequently experienced fatigue that interfered with

9

her concentration.  *Id.* at 696.  Dr. Tevrizian further estimated that Eckert would need two unscheduled 10-to-15 minute breaks from working each week, and that Eckert's impairments would likely cause her to miss work two or three times each month.  *Id.*

### C.   Legal Background

#### 1.   Five-Step Analysis for Determining Physical Disability

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The claimant bears the burden of proof for steps one through four, but the burden shifts to the Commissioner at step five.  *Id.*  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Id.*

At step one, the Administrative Law Judge ("ALJ") considers whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If she is, the ALJ must find that she is not disabled.  *Id.*  If she is not engaged in substantial gainful activity, the ALJ continues the analysis.  *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the regulations' twelve-month duration requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a

United States District Court
Northern District of California

list of impairments that the Commissioner has determined are disabling.  *See* 20 C.F.R.

§ 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination of the

claimant's impairments meets or equals the severity of a listed impairment, she is disabled.

20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

At step four, the ALJ considers the claimant's RFC in light of her impairments and

whether she can perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv) (citing 20 C.F.R.

§ 404.1560(b)).  If she can perform past relevant work, she is not disabled.  *Id.*  If she cannot

perform past relevant work, the ALJ proceeds to the final step.  *See id.*

At step five, the burden shifts to the Commissioner to demonstrate that the claimant, in

light of her impairments, age, education, and work experience, can perform other jobs in the

national economy.  *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *see also* 20 C.F.R.

§ 404.1520(a)(4)(v).  If the Commissioner meets this burden, the claimant is not disabled.

*See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and entitled to benefits if there

are not a significant number of jobs available in the national economy that she can perform.  *Id.*

### 2.   Determining Disability Where There Is Evidence of Mental Impairment

The Commissioner issued 20 C.F.R. § 404.1520a to supplement the five-step evaluation

process where, as here, the claimant alleges that one or more mental impairments prevents her

from working.  *See* 20 C.F.R. §§ 404.1520a, 416.920a; *see also Maier v. Comm'r of Soc. Sec.*,

154 F.3d 913, 914–15 (9th Cir. 1998) (per curiam); *Clayton v. Astrue*, No. CIV 09–2282 EFB,

2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011).  These regulations direct an ALJ to evaluate a

claimant's pertinent symptoms, signs, and laboratory findings to determine whether she has a

medically determinable mental impairment.  *See* 20 C.F.R. § 404.1520a(a).  In conducting this

inquiry, the ALJ must consider all relevant and available clinical signs and laboratory findings, the

effects of the claimant's symptoms, and how her functioning may be affected by factors that

include, but are not limited to, chronic mental disorders, structured settings, medication, and other

treatment.  *See* 20 C.F.R. § 404.1520a(b)–(c)(1).  The ALJ then assesses the degree of the

claimant's functional limitations based on those medically determinable mental impairments.

*See* 20 C.F.R. § 404.1520a(c)(2).

Although analysis under 20 C.F.R. § 404.1520a includes an assessment of the claimant's limitations and restrictions, it is not an RFC assessment. *See* SSR 96-8p, 1996 WL 374184. Rather, it is a component of analyzing the severity of mental impairments at steps two and three of the sequential evaluation process. *Id.* The mental RFC assessment used at steps four and five requires a more detailed assessment in which the ALJ must address the various functions that are contained in the broad categories found in Paragraphs B and C of the adult mental disorders listed in Listing 12.00 of the Listing of Impairments. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

### D.   Procedural History

Eckert applied for Social Security Disability Insurance Benefits under Title II of the Act on March 7, 2012. AR at 274–75. On December 5, 2012, she applied for Supplemental Security Income Benefits under Title XVI of the Act. *Id.* at 276–81. In those applications, she alleged that she suffered from medical impairments that had rendered her disabled on May 16, 2011. *See id.* at 274, 276. Her alleged spinal impairments were chronic osteoarthritis, degenerative disc disease, bone spurs, compression fractures, and severe back and hip pain. *Id.* at 132. She also alleged that she suffered from diabetes, insulin resistance, experiencing significant weight gain, depression, and severe anxiety. *Id.* Both applications were denied by the Administration initially and on reconsideration. *Id.* at 132–44, 146–75.

Eckert requested that an ALJ review the denial of her applications. *Id.* at 193–94. As described below, an ALJ convened a hearing and determined that Eckert was not disabled under the Act. *Id.* at 14–36, 71–131. Eckert requested review of that determination by the Administration's Appeals Council. *Id.* at 12–13. The Appeals Council denied that request. *Id.* at 1–5. Eckert then timely initiated this action under 42 U.S.C. § 405(g). *See* Compl., dkt. no. 1.

#### 1.   The Hearing

The ALJ convened the hearing on March 3, 2014. *See* AR at 71. The ALJ took testimony from three witnesses: medical expert Dr. Kweli Amusa; Eckert; and vocational expert Jeffery Malmuth. *Id.*

Dr. Amusa testified first. *See id.* at 76. She opined that Eckert suffered from the severe impairments of degenerative disc disease of the lumbar spine, asthma, obstructed sleep apnea,

diabetes complicated by diabetic retinopathy, and morbid obesity. *Id.* at 78.  She further opined that those impairments, considered individually and in combination, did not meet or equal a listing in the Act. *Id.* at 79.

Opining that Eckert's RFC fell within "a sedentary level," Dr. Amusa described Eckert's limitations as follows. *Id.*  Eckert could lift and carry more than ten pounds occasionally and less than ten pounds frequently. *Id.*  She could stand or walk for two hours and sit for six hours during an eight-hour workday. *Id.*  She might need to alternate between sitting and standing every 45 minutes. *Id.*  She could never climb ladders, ropes, or scaffolds, but could occasionally perform all other postural activities. *Id.* at 80.  Although she had tender finger joints, she lacked signs of inflammation or fenavitis and could frequently grip, handle, and manipulate objects with her fingers. *Id.* at 80–81.  She was limited to frequent overhead reaching due to a light compression fracture in a thoracic vertebra. *Id.* at 81.  She had no vision restrictions despite her diabetic retinopathy. *Id.*  Regarding work environments, she needed to avoid concentrated exposure to extreme cold and heat. *Id.*  She also needed to avoid moderate exposure to vibration, uneven terrain, fumes odors, gas, and poor ventilation. *Id.* at 81–82.

Dr. Amusa further opined that Eckert would likely be absent from work "once or twice a month." AR at 84–85.  She did not need unscheduled breaks to accommodate symptoms of pain or fatigue. *Id.*  Dr. Amusa specifically noted that Eckert's sleep apnea appeared to have significantly improved when she received a properly adjusted CPAP device. *Id.* at 84.

Dr. Amusa also individually addressed some of Eckert's physical conditions and limitations.  Regarding Eckert's capacity to sit, stand, and walk, images of her lumbar spine and sacroiliac joint showed degenerative and arthritic changes as well as degenerative disc disease, but she had undergone an orthopedic evaluation that was "fairly unremarkable.  Some decreased range of motion." *Id.* at 84–85.  Obesity limited Eckert to sedentary activity. *Id.* at 85.  Sleep apnea, which had functionally impacted Eckert for a short period after the sleep study and prescription of the CPAP, had not significantly impacted her for more than twelve months. *Id.* at 88.  Finally, although Eckert had a history of carpal tunnel syndrome, there was no evidence that she was being treated for it. *Id.* at 90.

1     Eckert's counsel asked Dr. Amusa to explain why her opinion diverged from those

2 contained in the materials submitted to the Administration by Eckert's doctors.  *Id.* at 87.  Dr.

3 Amusa replied that Eckert's doctors "don't actually explain their opinion" and offered to identify

4 the exhibits on which she had based her opinion.  *Id.*

5     After Dr. Amusa testified, the ALJ asked Eckert to describe the symptoms she experienced

6 from her alleged impairments.  *Id.* at 92.  Eckert first described several conditions that caused pain

7 in her bones, joints, and muscles.  Specifically, degenerative disc disease caused her to experience

8 muscle spasms and constant, moderately severe pain.  *Id.* at 92–93.  When her pain increased, she

9 changed positions.  *Id.* at 93.  Osteoarthritis affected her fingers, knees, shoulders, and hips.

10 *Id.* at 100.  The arthritis in her fingers had worsened, making her finger joints stiff.  *Id.* at 99–100.

11 She had undergone surgeries on her hands and wrists for issues related to carpal tunnel syndrome

12 and de Quervain's syndrome.  *Id.* at 97.

13     Eckert also described symptoms caused by breathing-related impairments.  Asthma caused

14 her to experience both shortness of breath and heavy breathing.  *Id.* at 93.  Her shortness of breath

15 was also accompanied by chest pains on days in which she moved more than usual.  *Id.* at 94.

16 Asthma caused her to feel faint and dizzy a few times each week.  *Id.* at 94–95.  Sleep apnea

17 caused her to stop breathing entirely and her heart to stop beating.  *Id.* at 95.  Although she had

18 been prescribed a CPAP device that permitted her to get a full night's sleep, she believed that she

19 could never again sleep without the device and survive.  *Id.* at 95–96.

20     Addressing her diabetes symptoms, Eckert explained that she frequently felt faint and

21 experienced poor blood circulation.  *Id.* at 94–95.  She suffered from neuropathy, which made her

22 feel numbness and pain in her feet, legs, and fingers.  *Id.*  Diabetic retinopathy caused her to

23 experience intermittent blurry vision and retinal hemorrhages.  *Id.* at 96–97.  Mild illnesses

24 became more severe because of her diabetes, often resulting in pneumonia or bronchitis infections.

25 *Id.* at 106.  When she had been working, those symptoms had caused her to use all of her vacation

26 and sick leave early in the year.  *Id.*  She was also "extremely resistant" to her diabetes

27 medication, frequently needing to take hundreds of insulin units at once.  *Id.* at 102.  She

28 explained that insulin had caused her to gain "about 100 pounds within six to eight months."  *Id.*

United States District Court
Northern District of California

14

1    Her weight at the time of the hearing was 340 pounds.  *Id.*

2    Regarding her mental health symptoms, Eckert testified that, on more than one occasion,

3    anxiety had caused her to think that she was having a heart attack.  *Id.* at 100.  Anxiety and

4    depression affected her social life and caused panic attacks, low energy, and a lack of motivation.

5    *Id.*  Attention deficit hyperactivity disorder made it difficult for her to focus on regular tasks.

6    *Id.* at 105.

7    Describing her daily life, Eckert testified that she showered daily while seated in a chair,

8    shopped online, and did her own laundry, but did little else.  *Id.* at 104–05.  She did not use a cane

9    when she ambulated, but used an electric cart when shopping for groceries.  *Id.* at 76.  While at

10   home, she moved around by going from one seat to another, taking breaks to sit and rest.  *Id.*  She

11   slept irregularly and intermittently—after a few hours of being awake, she would lie down and fall

12   asleep because it eased her back pain.  *Id.*

13   Eckert also described working as a doctor's assistant at an optometrist's office after

14   receiving educational training for the position.  *Id.* at 107, 112–13.  Before that work, she had jobs

15   related to child care and family services.  *Id.*  She had also worked as a résumé editor for

16   approximately six months.  *Id.* at 114–15.  Eckert stopped working in May 2011 after her weak

17   immune system caused her to get sick repeatedly.  *Id.* at 98–99.  Shortly after she stopped

18   working, she had gallbladder surgery and was placed on short-term disability.  *Id.* at 99.  Although

19   she had tried to take care of herself after her surgery, her health continued to deteriorate and she

20   never returned to work.  *Id.*

21   Testifying next, the vocational expert ("VE") opined that Eckert's past jobs constituted

22   work as a medical assistant, child monitor or babysitter, sorter or pricer, and job development

23   specialist.  *Id.* at 113–14.  The ALJ then proposed the following hypothetical RFC to the VE:

24   [A] capacity for sedentary work that would allow or need a change
     of position approximately every 45 minutes for one or two minutes,
25   what we typically call a stretch break. No ladders, ropes, scaffolds.
     Crouch, crawl, kneel, stoop, balance, ramps, stairs are all occasional.
26   Handling and fingering are frequent. Overhead reaching is frequent.
     Avoid concentrated exposure to heat or cold. And avoid even
27   moderate exposure to vibrations.

28   *Id.* at 116–17.  The ALJ then asked the VE whether a person with that RFC could perform

United States District Court
Northern District of California

Eckert's past work.  *Id.*  The VE opined that such a person could perform the work of a job development specialist as Eckert had performed it.  *Id.* at 117.  The VE further opined that a person with that RFC could perform other sedentary work, including work as a doctor's office receptionist, appointment clerk, call-out operator, and charge account clerk.  *Id.* at 117–18.  On cross-examination, the VE also opined that a person with that RFC could not perform any of those jobs if that person regularly missed two or more days each month.  *Id.* at 127.

### 2.  The ALJ's Decision

#### a.  Steps One Through Three

Employing the five-step evaluation process, the ALJ explained at step one that there was no evidence that Eckert had engaged in substantial gainful employment since the alleged onset date of May 16, 2011.  AR at 17–19.

At step two, the ALJ found that Eckert suffered from the severe impairments of degenerative disc disease of the lumbar and thoracic spine, asthma, diabetes mellitus, and morbid obesity.  *Id.* at 19.  The ALJ explained, "Although the records also describe various other physical conditions for which the claimant has received some medical treatment in the past, no other 'severe' impairment is established."  *Id.* at 20.  The ALJ detailed his analysis of Eckert's sleep apnea, finger joint tenderness, history of diabetic retinopathy, and visual problems.  *Id.* at 20–21.  The ALJ also specifically addressed Eckert's allegations of anxiety and depression, explaining his reasoning regarding Paragraphs B and C of the mental impairment analysis.  *Id.* at 21.  Concluding that Eckert's mental impairments were not severe, the ALJ found that her daily-living activities, social functioning, concentration, persistence, and pace were no more than mildly impaired.  *Id.* at 21–22.  The ALJ also found that Eckert had not experienced an episode of decompensation that lasted for an extended duration.  *Id.* at 22.

At step three, the ALJ found that Eckert did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 22.  The ALJ specifically addressed three of Eckert's severe impairments.  Regarding Eckert's degenerative disc disease, the ALJ explained that the record "does not describe the evidence of nerve root compression characterized by pain, limitation

16

of motion in the spine, motor loss and sensory or reflex loss, as required under Section 1.04 for a Listing level disorder of the spine." *Id.* The ALJ similarly described Eckert's asthma as lacking the frequency of attacks "contemplated under Section 3.03 for Listing level asthma." *Id.* After noting that "obesity is no longer a listed impairment," the ALJ found that "objective medical evidence in this case does not suggest that the cumulative effects of [Eckert's] obesity meet the criteria set forth in any section of the Listings and Social Security Ruling 02-1p." *Id.* at 23.

b. Step Four

At step four, the ALJ found that Eckert had the RFC to perform sedentary work that allowed her to change positions for 1 or 2 minutes every 45 minutes. *Id.* The ALJ also found that Eckert "can do no climbing of ladders, ropes or scaffolds; she can perform all other postural activities frequently; she can do frequent overhead reaching, handling, and fingering." *Id.* The ALJ further found that Eckert needed to avoid concentrated exposure to extreme temperatures and moderate exposure to vibrations, uneven terrain, chemical fumes, odors, gases, and poor ventilation. *Id.*

After listing some of Eckert's treatment history, the ALJ addressed Dr. Qadir's assessment of Eckert's work capacity in light of her diabetes, obesity, sleep apnea, depression, and anxiety. *Id.* at 22–24. The ALJ explained:

> Stating that claimant had all 'bad days,' [Dr. Qadir] concluded that [Eckert] could sit/stand/walk for no more than 2 hours per day and lift 10 pounds occasionally, should not stand/walk continuously, was moderately limited in the use of her upper extremities, could not push, kneel, bend or stoop, should avoid temperature extremes and heights and could not concentrate. [Dr. Qadir] then stated that the claimant would probably need permanent disability [citation]. Likewise, in the following month, Dr. Qadir stated that the claimant needed to be on disability to take care of her multiple health problems [citation].

*Id.* at 24.

The ALJ next addressed Dr. Ohmoto's October 2012 and July 2013 evaluations of Eckert. *Id.* The ALJ stated that Dr. Ohmoto's October 2012 records indicated that Eckert had refused to take narcotic pain medication and was taking only over-the-counter medication to treat her pain. *Id.* The ALJ described Dr. Ohmoto's evaluation of Eckert's work capacity as follows:

United States District Court
Northern District of California

17

1

> [Eckert] could sit for 7 hours and stand/walk for 0-1 hour, would
> need to change positions for 1-5 minutes every 20 minutes, could lift
> 20 pounds occasionally and 5 pounds frequently, could do no
> pushing, pulling, kneeling, bending or stooping and could not
> tolerate more than moderate stress [citation].

2

3

4

*Id.*

5

Detailing Eckert's recent history of asthma, the ALJ observed that x-rays obtained in

6

February and May 2011 suggested that Eckert had low lung volumes but did not have

7

cardiopulmonary disease. *Id.* at 24. The ALJ described evaluations in which Dr. Qadir observed

8

severe asthma symptoms followed by appointments during which no respiratory problems were

9

noted. *Id.* The ALJ also stated that evaluations by Drs. Tevrizian and Pandya in 2011 and 2012

10

included notations of asthma symptoms that were "severe but fluctuating," "only mildly severe,"

11

and "intermittent only." *Id.* at 24–25.

12

Addressing Dr. Tevrizian's opinions regarding Eckert's asthma, allergies,

13

gastroesophageal reflux disease, sleep apnea, hyperglycemia, and obesity, the ALJ found that Dr.

14

Tevrizian had opined:

15

> [Eckert's] impairments limited her to sitting for 3 hours in an 8 hour
> day, standing/walking for 2 hours in an 8 hour day, and lifting 5
> pounds occasionally, and that she should avoid exposure to odors,
> fumes, perfumes, gases, solvents/cleaners, cigarette smoke,
> soldering fluxes, chemicals, temperature extremes and dust
> [citations].

16

17

18

*Id.* at 25.

19

The ALJ then turned to medical expert Dr. Amusa's opinion, describing it as follows:

20

> [Eckert] can perform sedentary work involving a change positions
> [*sic*] for 1-2 minutes every 45 minutes, no climbing of ladders, ropes
> or scaffolds, the ability to perform all other postural activities
> frequently, frequent overhead reaching, handling and fingering, no
> exposure to temperature extremes, not even moderate exposure to
> vibrations, uneven terrain, chemical fumes, odors, gases and a
> preclusion against employment in a work setting with poor
> ventilation.

21

22

23

24

*Id.* The ALJ found Dr. Amusa's opinion consistent with the record. *Id.* The ALJ then explained

25

that he accorded that opinion great weight and found that Eckert could "perform the limited range

26

of sedentary work identified by" Dr. Amusa. *Id.* at 25.

27

Next, the ALJ stated that he rejected the opinions of Drs. Qadir, Tevrizian, and Ohmoto.

28

United States District Court
Northern District of California

18

1   *Id.* at 25–26.  Regarding Dr. Qadir's opinion, the ALJ reasoned:

2
3
4
5
6
7
> I reject Dr. Qadir's September 2012 work limitations as they are significantly out of proportion with the objective findings. Dr. Qadir described no positive objective findings that would suggest that the claimant was limited to sitting for only 2 hours or that she was limited in the use of her upper extremities. Moreover, Dr. Qadir's finding that the claimant has all 'bad days' is not consistent with the claimant's history and her own reports that her symptoms have fluctuated. I also note that Dr. Qadir considered the claimant's mental condition in assessing her work capacity but [Dr. Qadir] is not a psychiatrist and the limitations that [Dr. Qadir] identified on the basis of [Eckert's] mental condition are entitled to no deference.

8   *Id.* at 25.

9        The ALJ then explained that he accorded no weight to Dr. Tevrizian's opinion regarding

10  Eckert's work capacity, explaining that, at the time Dr. Tevrizian rendered her opinion, she had

11  not seen Eckert for six months.  *Id.* at 26.  The ALJ further explained that Dr. Tevrizian's

12  treatment records "describe no significant positive objective findings to suggest that [Eckert] was

13  limited to sitting 3 hours in an 8 hour day."  *Id.*

14       Likewise, the ALJ rejected Dr. Ohmoto's opinion, stating that it was unsupported by

15  objective medical evidence in the record.  *Id.*  The ALJ explained reasoned:

16
17
18
19
20
> Although Dr. Ohmoto found that the claimant would have to change positions for 1-5 minutes every 20 minutes, such a limitation is inconsistent with the limited findings reported in his treatment records and the fact that he saw the claimant on only 3 occasions over a 13 month period.  In fact, it appears that Dr. Ohmoto based his October 2012 conclusions regarding the claimant's work capacity on subjective factors, i.e., he indicated that [Eckert's] pain was not well-controlled, but even that observation is inconsistent with [Eckert's] report that she was taking only Motrin for pain.

21  *Id.*

22       The ALJ further explained that he accorded no weight to the opinions of Drs. Qadir,

23  Tevrizian, and Ohmoto because they were inconsistent with the testimony of Dr. Amusa.  *Id.*  The

24  ALJ elaborated that Dr. Amusa's testimony was supported by the objective medical findings in the

25  record.  *Id.*  The ALJ also noted that "the treating source opinions have a distinct tone of advocacy

26  about them and their authors do not even purport to explain the objective facts that might support

27  the opinions."  *Id.*

28       Turning to Eckert's testimony, the ALJ stated, "I find specific and legitimate reasons to

United States District Court
Northern District of California

reject the claimant's statements and those of her mother regarding her symptoms." *Id.*  The ALJ reasoned that Eckert was capable of engaging in a variety of activities while sitting, which included cooking, watering plants, feeding her dogs, performing light cleaning, grocery shopping, visiting with friends, and traveling out of state for two weeks. *Id.*  The ALJ further reasoned that Eckert had often failed to comply with her diabetes treatment and noted that "her blood sugars had improved" when she had complied. *Id.*  The ALJ reiterated that Eckert took only over-the-counter medication for her back pain and that the record evidenced minimal mental health treatment for her alleged mental impairments. *Id.*  The ALJ found that Eckert's "medically determinable impairments could reasonably be expected to cause some alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." *Id.* at 27.

Noting the VE's testimony, the ALJ concluded that Eckert was "capable of performing past relevant work as a job development specialist.  This work does not require the performance of work-related activities precluded by [Eckert's] residual functional capacity . . . ." *Id.* at 27.

### c.  Step Five

The ALJ alternatively considered step five, finding that Eckert could perform other jobs in the national economy.  AR at 27.  Stating that Eckert was a younger individual with a high school education who could communicate in English and had acquired skills from her past work, the ALJ found that she could work as a doctor's office receptionist or an appointment clerk. *Id.* at 28.

The ALJ concluded that Eckert was not disabled under the Act and affirmed the denials of her applications for disability insurance and Social Security Income benefits. *Id.* at 29.

### E.  The Motions

Eckert has moved for summary judgment, claiming that the ALJ erred in two general respects. *See* Pl.'s Mot. for Summ. J. or Remand (the "Motion," dkt. no. 15) at 11–12, 18–21.  First, she contends that the ALJ improperly rejected the medical opinions of her treating physicians—Drs. Qadir, Tevrizian, and Ohmoto—while granting great weight to the nonexamining medical expert, Dr. Amusa. *Id.* at 11–12.  Second, she contends that the ALJ erroneously rejected her testimony regarding the severity of her symptoms. *Id.* at 18–21.

1     Regarding her first contention, Eckert argues that the ALJ's rejection of Dr. Qadir's

2   medical opinion was erroneous. *See id.* at 12–14. She asserts that the record contradicts that

3   ALJ's finding that Dr. Qadir's functional limitation assessment was unsupported by positive

4   objective findings. *See id.* at 12. She further maintains that Dr. Qadir's assessment of her sitting

5   and upper extremity limitations were supported by imaging and clinical examinations that

6   confirmed Eckert's pain in her lower back, bilateral shoulders, hands, and wrists. *Id.* at 12–13.

7   Eckert criticizes the ALJ's reasoning that Dr. Qadir's opinion that Eckert has "all bad days" was

8   inconsistent with the record. *Id.* at 13. Eckert also disputes the ALJ's disregard of Dr. Qadir's

9   opinions regarding Eckert's mental health on the ground that Dr. Qadir "is not a psychiatrist,"

10   asserting that it is legally improper. *Id.* at 13–14.

11     Eckert next argues that the ALJ's rationales for rejecting Dr. Tevrizian's opinion were

12   legally insufficient. *Id.* at 14–15. She asserts that discrediting Dr. Tevrizian's opinion due to the

13   six-month gap between Dr. Tevrizian's April 2012 evaluation of Eckert and October 2012

14   functional assessment is illogical because the evidence in the record indicates that the symptoms

15   that Dr. Tevrizian treated had persisted during the relevant time period. *Id.* at 14–15. Second, she

16   disputes the ALJ's determination that Dr. Tevrizian's finding that Eckert can sit for no more than

17   three hours during a workday was unsupported by "positive objective findings," arguing that Dr.

18   Tevrizian's observations of Eckert's obesity, history of infection, fatigue, gastrointestinal

19   symptoms, and hyperglycemia supported that medical opinion. *Id.* at 15.

20     Eckert also argues that the ALJ offered legally insufficient rationales for rejecting the

21   opinion of Dr. Ohmoto. *Id.* at 15–18. Eckert disputes the ALJ's determination that Dr. Ohmoto's

22   opinion regarding her need to alternate between sitting and standing was inconsistent with Dr.

23   Ohmoto's treatment records, arguing that Dr. Ohmoto's opinion was based on several clinical

24   findings. *Id.* at 16. She also asserts that the ALJ improperly reasoned that the few appointments

25   she had with Dr. Ohmoto supported his decision to give Dr. Ohmoto's opinion less weight. *Id.*

26   at 16–17.

27     Turning to her own testimony, Eckert contends that the ALJ failed to provide clear and

28   convincing reasons for finding that her statements regarding the severity of her symptoms were

United States District Court
Northern District of California

21

not credible. *Id.* at 18–21.  First, she argues that the ALJ erroneously found that Eckert's daily-living activities were inconsistent with her claims, asserting that the ALJ was required to find that she spent a substantial part of her day doing those activities. *Id.* at 19.  Second, she disputes the ALJ's finding that she had failed to comply with her diabetes treatments. *Id.* at 19–20.  She further asserts that her diabetes and morbid obesity are interrelated, and, together, those conditions cause her nonvolitional, excessive eating habits that, in turn, cause greater lower back and knee pain. *Id.*  Third, she asserts that the ALJ erroneously reasoned that Eckert's use of over-the-counter medication evidenced that she had overstated the extent of her pain. *Id.* at 20–21.  Eckert specifically identifies treatment notes reflecting that prescription medications make her nauseous and increase her anxiety, and that her obesity has prevented her from receiving pain medications through injections. *Id.* (citing AR at 709).

Eckert concludes that the medical opinions of Drs. Qadir, Tevrizian, and Ohmoto should be credited as true, that her testimony should likewise be credited as true, and that the ALJ's decision should be reversed and remanded with instructions to award benefits. *Id.* at 21.  Alternatively, Eckert requests that the case be remanded for further proceedings. *Id.*

In opposition, the Commissioner filed a Cross-Motion for Summary Judgment. Def.'s Cross-Mot. for Summ. J. in Opp'n to Pl.'s Mot. ("Opp'n," dkt. no. 16).  Claiming that the ALJ's decision is supported by substantial evidence and is free of legal error, the Commissioner requests that the decision be affirmed. *Id.* at 9.  In support of that claim, the Commissioner contends that the ALJ properly rejected the opinions of Drs. Qadir, Tevrizian, and Ohmoto. *Id.* at 2.

The Commissioner first argues that the ALJ properly rejected those opinions after correctly determining that the clinical findings in the record were consistently normal. *Id.* at 2–4.  The Commissioner further asserts that the doctors' assessments of Eckert's impairments contradicted those findings, noting discrepancies regarding fatigue, depression, anxiety, back pain, and asthma. *Id.* at 2–3.

The Commissioner further argues that the ALJ properly rejected the doctors' opinions because the record demonstrated that Eckert's symptoms were adequately controlled by treatment. *Id.* at 4–5.  The Commissioner asserts that the record shows that Eckert did not always comply

United States District Court
Northern District of California

with her diabetes treatment.  *Id.*  The Commissioner also asserts that, when Eckert complied with that treatment, her symptoms quickly improved; medication effectively controlled her anxiety and depression; Eckert's CPAP machine effectively treated her sleep apnea and reduced her fatigue; and medication adequately controlled her asthma symptoms.  *Id.*

The Commissioner also contends that substantial evidence supported Dr. Amusa's testimony, which in turn supported the ALJ's rejection of the doctors' findings.  *Id.*

Turning to Eckert's credibility, the Commissioner contends that the ALJ provided valid reasons for rejecting her testimony.  *Id.*  The Commissioner first argues that the medical evidence, which constituted "normal clinical findings," generally undermines Eckert's complaints regarding the severity of her symptoms.  *Id.* at 7–8.  The Commissioner specifically notes that Dr. Kostalnick's January 26, 2012, mental-status examination yielded "generally normal" results.  *Id.* The Commissioner also argues that Eckert's impairments were adequately controlled by treatment. *Id.* at 8.  Next, the Commissioner argues that the ALJ reasonably found that Eckert's daily-living activities undermined her claims.  *Id.*  The Commissioner further argues that Eckert's conservative treatment similarly undermined her claims of disabling pain and impairment.  *Id.*

The Commissioner concludes that, should the Court find the ALJ erred, the appropriate remedy is a remand for further proceedings.  *Id.* at 9.

In reply, Eckert generally responds to the Commissioner's characterizations of her arguments.  *See* Reply, dkt. no. 17.  She also repeats her request for a remand instructing the Commissioner to award her benefits.  *Id.* at 3.

### III.    ANALYSIS

#### A.    Legal Standard

When reviewing the Commissioner's decision to deny benefits, the Court "may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)) (quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence must be based on the record as a whole and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

United States District Court
Northern District of California

402 U.S. 389, 401 (1971).  Substantial evidence "must be 'more than a mere scintilla,' but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quoting *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)).  Even if the Commissioner's findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

The Court must review the record as a whole, considering the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).  "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  Reviewing courts "are constrained to review the reasons the ALJ asserts" and "cannot rely on independent findings" to affirm the ALJ's decision.  *Connett v. Barnhart*, 340 F.3d 871, 874 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits.  See *Garrison v. Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

### B.     The ALJ Improperly Rejected the Opinions of Eckert's Treating Doctors

#### 1.   Legal Standard for Reviewing the Rejection of a Treating Doctor's Opinion

Eckert claims that the ALJ improperly rejected the opinions of her treating doctors.  "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.  The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a

United States District Court
Northern District of California

1  contradictory medical opinion:

> If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be entitled to the greatest weight . . . even if it does not meet the test for controlling weight. An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.
>
> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.

*Garrison*, 759 F.3d at 1012–13 (quotation marks, citations, and footnote omitted).

### 2.   The ALJ Erroneously Rejected the Opinions of Eckert's Treating Doctors

The ALJ rejected the opinions of Eckert's treating physicians—Drs. Qadir, Tevrizian, and Ohmoto—and provided several reasons for doing so in the decision.  Eckert contends that each reason was erroneous, i.e., that the ALJ failed to state a legitimate reason that was supported by substantial evidence.  The Court agrees, and will address each reason offered by the ALJ in turn. As described below, central to the Court's analysis is the dearth of consideration that the ALJ gave to one of Eckert's severe impairments—morbid obesity—in rejecting the doctors' opinions.

The ALJ's reliance on the testimony of Dr. Amusa, a nonexamining physician, to reject the opinions of Eckert's treating doctors was error.  The ALJ granted great weight to Dr. Amusa's opinion after reasoning that it was supported by objective findings regarding Eckert's diabetes, asthma, and back pain, although the ALJ did not mention Dr. Amusa's lack of substantive testimony on Eckert's morbid obesity.  Furthermore, the ALJ improperly ignored a crucial part of Dr. Amusa's testimony: when asked why her opinion diverged from those expressed in the letters sent by Eckert's treating physicians, Dr. Amusa only stated that "their letters don't actually explain their opinion."  AR at 87.  This conclusory statement is insufficient to constitute

United States District Court
Northern District of California

1   substantial evidence for the purpose of rejecting the opinions of treating physicians.  *Cf. Orn v.*

2   *Astrue*, 495 F.3d 625, 633 (9th Cir. 2007) (explaining that an examining physician's medical

3   opinion is not a basis for rejecting the opinions of treating physicians when the examining

4   physician's opinion rests on the same medical findings in reaching a different conclusion).

5          Dr. Amusa's testimony is also contradicted by the record.  First, as described below, the

6   findings of the treating physicians are worthy of credence.  Moreover, those opinions contradict

7   Dr. Amusa's opinions.  In opining on whether Eckert was disabled, Eckert's treating physicians

8   offered several explanations founded on particular findings that were supported in the record.  Dr.

9   Qadir's completed questionnaire provides lists of diagnoses and symptoms.  *See* AR at 670–71.

10  Dr. Qadir also explained how Eckert's severe impairments were interrelated.  For example, Dr.

11  Qadir explained that Eckert suffered from constant neuropathic pain, back pain, and foot pain that

12  were associated with her obesity and uncontrolled diabetes.  *See id.* at 671–72.  Likewise, Drs.

13  Ohmoto and Tevrizian provided multiple diagnoses and symptoms that underpinned their

14  assessments of Eckert's RFC.  *See id.* at 692–96, 698–704.  In sum, Dr. Amusa's testimony is of

15  no value because it is contradicted by the opinions of Eckert's treating physicians and the record

16  as a whole.  *See* 20 C.F.R. § 404.1527(d)(3) ("[B]ecause nonexamining sources have no

17  examining or treating relationship with you, the weight we will give their opinions will depend on

18  the degree to which they provide supporting explanations for their opinions.  We will evaluate the

19  degree to which these opinions consider all of the pertinent evidence in your claim, including

20  opinions of treating . . . sources.").

21         Dr. Amusa's testimony regarding Eckert's obesity further demonstrates the ALJ's error.

22  While she mentioned that Eckert "would be considered morbidly obese" at the outset of her

23  testimony, Dr. Amusa's substantive discussion of that severe impairment's effect on Eckert's

24  disability status was limited to one statement: Eckert's obesity "was the reason I put her at a

25  sedentary level.  I considered obesity."  *Id.* at 85.  Drs. Qadir and Ohmoto expressly cited obesity

26  as a stand-alone ailment from which Eckert suffered as well as a condition that contributed to the

27  severity of Eckert's other impairments.  *See id.* at 671–72, 707.  Moreover, Dr. Qadir had opined

28  in treatment notes that Eckert's obesity was of such significance that drastic measures like

United States District Court
Northern District of California

1   hypnotherapy and tying her jaw shut warranted consideration. *Id.* at 714. Dr. Amusa's failure to

2   substantively address Eckert's morbid obesity contributed the ALJ's erroneous reliance on her

3   testimony in rejecting the opinions of Eckert's treating physicians.

4          Second, the ALJ's impression of the treating physicians' opinions, that they had the

5   "distinct tone of advocacy," is not a legitimate basis for rejecting those opinions. *See id.* at 26.

6   On this point, *Lester v. Chater* is instructive. *See* 81 F.3d 821 (9th Cir. 1995). There, an ALJ

7   rejected the opinion of an examining psychologist on the grounds that the opinion had been

8   obtained expressly for the purpose of litigation. *Id.* at 832. The Ninth Circuit determined that this

9   reasoning was erroneous and held that "[t]he purpose for which medical reports are obtained does

10  not provide a legitimate basis for rejecting them. . . . 'The Secretary may not assume that doctors

11  routinely lie in order to help their patients collect disability benefits.'" *Id.* (quoting *Ratto v. Sec'y,*

12  *Dept. of Health and Hum. Serv.*, 839 F. Supp. 1415, 1426 (D. Or. 1993)). Here the ALJ

13  improperly relied on his impression of the tone expressed by Eckert's care providers as a basis for

14  rejecting their medical opinions.

15         This aspect of the ALJ's reasoning—the treating physicians' tones—also rested on the

16  ALJ's determination that Eckert's doctors failed to support their opinions with objective evidence.

17  However, the ALJ failed to consider that the opinions of Eckert's treating physicians are generally

18  consistent with one another. *Cf.* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an

19  opinion is with the record as a whole, the more weight we will give to that opinion."). 

20  Furthermore, the treating physicians did in fact support their opinions with objective evidence,

21  those opinions were further supported by the entirety of the record, and the ALJ's reasons for

22  rejecting the opinions were legally improper.

23            a.   Dr. Qadir

24         The ALJ's first reason for rejecting Dr. Qadir's opinion was that it was "significantly out

25  of proportion with the objective findings," and Dr. Qadir had failed to support her opinion

26  regarding Eckert's sitting and upper-extremity limitations with objective evidence. *Id.* at 25.

27  Second, the ALJ considered Dr. Qadir's statement that Eckert had "all 'bad days'" to be

28  inconsistent with Eckert's history and self-reports. *Id.* Neither of the reasons is legitimate or

otherwise supported by substantial evidence.  In fact, the record contradicts them.[2]

The Ninth Circuit has explained that, "[a]lthough the ALJ is not bound by an expert medical opinion on the ultimate question of disability, [the ALJ] must provide specific and legitimate reasons for rejecting the opinion of a treating physician.  [Citation.]  The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [the ALJ's] interpretation thereof, and making findings.  [Citation.]"  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  Here, the ALJ's summary of the facts and clinical evidence that conflict with Dr. Qadir's opinion is cursory and incomplete.  Namely, in rejecting Dr. Qadir's opinion, the ALJ's analysis was limited to the two findings stated above: (1) that Dr. Qadir had failed to identify objective findings supporting the conclusions that Eckert was capable of sitting for a maximum of two hours and had limited use of her upper extremities; and (2) Dr. Qadir's opinion that Eckert had "all 'bad days'" was inconsistent with Eckert's medical history and self-reports.  *See* AR at 25.  These findings fall short of a detailed and thorough summary that describes conflicting clinical evidence considering the three years of treatment that Dr. Qadir provided to Eckert.

The ALJ also ignored the parts of the September 2012 questionnaire describing objective findings.  Dr. Qadir identified clinical findings related to Eckert's blood tests that established Eckert could not control her blood sugar and suffered from fatigue.  *See id.* at 670.  Dr. Qadir further explained that she had determined that Eckert suffered from diffuse neuropathic pain and back pain caused by diabetes and obesity.  *See id.* at 671–72.  Dr. Qadir further estimated that, on a one-to-ten scale, Eckert's level of pain was seven, and her level of fatigue was nine.  *Id.* at 672.  Thus, contrary to the ALJ's assertion, Dr. Qadir described some of the findings that directly supported her medical opinions in the questionnaire.

---

[2] The ALJ also stated that the opinion of Dr. Qadir was entitled to no deference to the extent that she had considered Eckert's mental limitations.  *See* AR at 25–26.  As a matter of law, an ALJ may not reject the opinion of a treating physician solely because it pertains to a matter outside the doctor's expertise.  *See Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); 20 C.F.R. § 404.1527(d)(3).  However, having found that the ALJ provided insufficient reasons for rejecting Dr. Qadir's opinions regarding Eckert's physical impairments, the Court need not further address this matter.

Moreover, objective findings contained in treatment notes supported Dr. Qadir's opinion. Between June 2010 and October 2011, Eckert's weight increased by 71 pounds; at the time of the 2013 hearing, she testified to weighing 340 pounds, a weight that was 110 pounds greater than her normal weight before she turned 30 years old. *See* AR at 102, 403, 442–43. This dramatic increase in weight coincided with her increasing resistance to insulin. *See id.* at 428, 711, 714. According to the treatment notes of Drs. Qadir and Talwar, it also contributed to Eckert's back pain and limited the extent to which that pain could be treated. *See id.* at 415, 428. Dr. Qadir's opinion that Eckert suffered from several severe, interrelated ailments that rendered her capacity to sit or stand for long periods was therefore supported by the record. Even if Dr. Qadir used exaggerated terms to describe how Eckert's impairments impacted her daily life, the ALJ was not entitled to reject Dr. Qadir's opinion in its entirety.

Likewise, Eckert's self-reports do not support the ALJ's rejection of Dr. Qadir's medical opinion. In the decision, the ALJ discussed four findings of self-reports related to Eckert's alleged nondisability: (1) during a March 2012 appointment, Eckert reported to Dr. Qadir "that she was experiencing no problems with her asthma or any other condition"; (2) Eckert had made "reports that her symptoms have fluctuated"; (3) Eckert had reported successfully traveling by plane; and (4) Eckert had reported taking only over-the-counter pain medication. *Id.* at 25–27. None of these findings rise to the level of a specific and legitimate reason supported by substantial evidence.

First, the ALJ's assertion regarding Eckert's March 2012 self-report is false. Nowhere in the March 2012 treatment record to which the ALJ cites is there evidence that Eckert reported that she was not experiencing a medical problem related to her asthma or any of her other chronic conditions. *See id.* at 25, 425–26, 428. Treatment notes from a February 2012 appointment with Dr. Qadir, the record on which the ALJ may have intended to rely, reflect that Eckert reported feeling better after seeing a psychiatrist and experiencing improvements related to her asthma and sleep apnea. *See id.* at 427, 429–31. However, while this record also contains the notation that the appointment occurred "without mention of complication" relating to Eckert's diabetes or obesity, it cannot be reasonably construed as evidence that Eckert affirmatively stated that she was not experiencing problems with her other impairments. *See id.* at 430. In fact, the treatment notes

reflect that Dr. Qadir and Eckert discussed pain control options relating to a compression fracture in Eckert's back. *Id.*

Second, the ALJ's finding regarding the March 2012 appointment and his more general finding that Eckert had reported fluctuating symptoms are improperly cursory, selective, and vague. On this point, *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001), is instructive. There, the Ninth Circuit determined that an ALJ erred by rejecting the opinion of a treating doctor on the grounds that the doctor's treatment notes were inconsistent with the medical opinion that he rendered during the disability proceeding. *See id.* at 1201, 1204–05. The Ninth Circuit reasoned that "the ALJ [was] selective in his reliance on [the doctor's] treatment notes, exaggerate[d] in his description of their contents, and misattribute[d] statements to" the doctor. *Id.* at 1205. As discussed above, the ALJ's description of a single self-report in March 2012 was, at minimum, selective and exaggerated. Because Dr. Qadir was the individual who authored the cited treatment record, the ALJ's finding also constitutes the misattribution of statements and knowledge to Dr. Qadir. Likewise, the ALJ's reliance on the general finding that Eckert had reported fluctuating symptoms, which he asserted without citation to the record, amounts to a finding that rested on a selective and exaggerated review of the record. As the Ninth Circuit emphasized in *Holohan*, a treating doctor's "statements must be read in context of the overall diagnostic picture" and "some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Id.*

Third, as explained below, the ALJ's reference to Eckert's use of over-the-counter pain medication is misleading: evidence in the record demonstrated that Eckert was intolerant to other medication and that the treatment she had received was insufficient to alleviate her pain. *See*, *e.g.*, *id.* at 698, 728. The ALJ's tacit reference to a single plane trip as evidence that Eckert could work consistently, without further explanation or analysis, also falls short of the specific and legitimate standard.

Finally, Eckert's self-reports, considered with her medical history, support Dr. Qadir's medical opinion. Starting around the onset date of her disability, Dr. Qadir's treatment notes reflect that Eckert often complained of respiratory problems related to asthma, coughing, and

1    bronchitis; described worsening lower back pain; failed to address her morbid obesity; and

2    struggled to control her diabetes as it became increasingly insulin resistant.  *See* AR at 423, 435,

3    449–50, 452, 454, 458, 460, 462, 472–73.  Even if there were some evidence that Eckert had

4    occasionally described temporary improvement for some of her ailments, the record does not

5    plausibly support the conclusion that she ever reported to Dr. Qadir that her severe impairments

6    and general medical condition were improving as a whole.  Such a report would contradict the

7    evidence that Eckert's diabetes and morbid obesity progressively worsened and adversely

8    impacted her other severe impairments and chronic medical conditions.  In sum, the ALJ failed to

9    provide a specific or legitimate reason that was supported by substantial evidence for his

10   conclusion that Eckert's self-reports and medical history contradicted Dr. Qadir's medical opinion.

b.  Dr. Tevrizian

12       The ALJ provided two reasons for rejecting Dr. Tevrizian's opinion: (1) six months had

13   elapsed between Dr. Tevrizian's meeting with Eckert and the completion of the questionnaire

14   containing Dr. Tevrizian's opinion; and (2) Dr. Tevrizian's treatment records do not describe

15   positive objective findings regarding Eckert's seating limitations.  *See* AR at 26.  Neither are

16   legitimate rationales for rejecting Dr. Tevrizian's opinion.

17       First, Eckert alleged that she became disabled in May 2011.  *See id.* at 17.  Dr. Tevrizian

18   started treating Eckert in October 2011.  *See id.* at 528.  Thus, Dr. Tevrizian's medical opinion was

19   based solely on Eckert's health during the relevant time period.  The ALJ made no finding that

20   Eckert's impairments had improved since she was last treated by Dr. Tevrizian or otherwise

21   explained how the period between that treatment and the questionnaire's completion rendered Dr.

22   Tevrizian's opinion unreliable.  This reason for rejecting Dr. Tevrizian's opinion fails as a matter

23   of logic.

24       Second, in the questionnaire, Dr. Tevrizian defined her specialties as allergy and

25   immunology.  *See id.* at 697.  She also stated that she had treated Eckert for asthma, described the

26   laboratory tests that she performed, and identified the factors that precipitated Eckert's intermittent

27   and severe asthma attacks, some of which resulted in four weeks of incapacity.  *See id.* at 691–93.

28   She further opined that Eckert's asthma symptoms would frequently interfere with her work,

United States District Court
Northern District of California

31

resulting in unscheduled breaks and absences.  *See id.* at 696.  As a result, the ALJ's rejection of

Dr. Tevrizian's opinion on the narrow ground that she failed to support her opinion regarding

Eckert's seating limitations with objective findings is improper.  *See Tommasetti*, 533 F.3d

at 1041.

### c.  Dr. Ohmoto

The ALJ offered several narrow reasons for rejecting Dr. Ohmoto's opinion.  None are

legitimate or supported by substantial evidence.

First, the ALJ reasoned that Dr. Ohmoto's questionnaire responses regarding Eckert's need

to frequently change positions were inconsistent with the limited findings that he had noted in his

prior treatment records.  *See* AR at 26.  However, the record establishes the contrary: over more

than a year, Dr. Ohmoto consistently observed that Eckert experienced lower back pain related to

her lumbar spine.  *See id.* at 679–80, 683, 707, 727.  Furthermore, he noted that she had a bone

spur and that the cause of her back pain could be early degenerative arthritis or long-term obesity.

*See id.*

Second, the ALJ reasoned that Dr. Ohmoto's opinion was not entitled to weight because

the treatment that he provided was limited to 3 occasions over 13 months.  *Id.* at 26.  The record in

fact shows that there were four appointments during which Dr. Ohmoto treated Eckert.  *See id.*

at 679, 681, 707, 727.  Regardless, the ALJ's conclusory reasoning is insufficient to reject Dr.

Ohmoto's opinion.  For it to be legitimate, the ALJ was required to explain why the number of

instances in which Dr. Ohmoto treated Eckert was "inconsistent" with the opinion that he

rendered.  *See* 20 C.F.R. §§ 404.1527(c)(2)–(3); *cf.* 20 C.F.R. § 404.1502.  He did not.

Third, the ALJ reasoned that Eckert's use of over-the-counter pain medication was

inconsistent with Dr. Ohmoto's finding that her pain was not well-controlled.  *See* AR at 26.  This

reasoning is rebutted by the record.  Notes from Eckert's gallbladder surgery demonstrate that

Eckert's allergies limited her to narcotic pain medications and noted that Eckert could not use

codeine or Vicodin to treat her pain.[3]  *See id.* at 600.  Orthopedist Dr. Talwar observed that pain

---

[3] Nothing in Dr. Ohmoto's treatment records supports the ALJ's factual finding that Eckert "refused" narcotic pain medication.  *See* AR at 24.  The treatment records cited by the ALJ clearly

1   management injections would likely be ineffective due to Eckert's obesity.  *See id.* at 415.  During

2   an August 2012 evaluation, Dr. Ohmoto noted that Eckert was substantially intolerant to narcotic

3   pain medications.  *See id.* at 728.  Two months later, Dr. Ohmoto stated in the questionnaire that

4   Eckert was "intoleran[t] to typical pain medications."  *Id.* at 698.  In sum, the ALJ failed to

5   account for the substantial evidence in the record indicating that Eckert only used over-the-counter

6   medication to treat her pain for legitimate medical reasons.[4]

7       **C.   The ALJ Improperly Rejected Eckert's Testimony**

8           **1.   Legal Standard for Reviewing Claimant Credibility Findings**

9           To assess properly the credibility of a claimant's testimony regarding her subjective pain

10  and symptoms, an ALJ must engage in a two-step analysis.  *Garrison*, 759 F.3d at 1014.  First, the

11  ALJ determines whether the claimant presented objective medical evidence of an impairment that

12  could reasonably be expected to produce the alleged pain and symptoms.  *Id.* (quoting *Lingenfelter*

13  *v. Astrue*, 504 F.3d 1028, 1035–36 (2007)).  At this step, the claimant need only show that the

14  impairment could reasonably have caused some of the alleged pain and symptoms.  *Id.* (citing

15  *Smolen*, 80 F.3d at 1282).  If the first step is met and there is no evidence of malingering, the ALJ

16  can reject the claimant's testimony only by providing specific, clear, and convincing reasons.

17  *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281; *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883

18  (9th Cir. 2006)).  The Ninth Circuit has stated that "[t]he clear and convincing standard is the most

19  demanding required in Social Security cases."  *Id.* at 1015 (quoting *Moore v. Comm'r of Soc. Sec.*

20  *Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

21          **2.   The ALJ Failed to Offer Clear and Convincing Reasons**

22          Eckert contends that the ALJ failed to provide clear and convincing reasons for finding that

23  her testimony regarding the severity of her physical pain and symptoms lacked credibility.  The

24

25  ─────────────────────────
    indicate that Eckert was intolerant to that medication.  *See id.* at 698–709.

26  [4] The ALJ stated two additional reasons for rejecting Dr. Ohmoto's opinion: (1) Dr. Ohmoto had
    opined on Eckert's mental impairments, which was beyond his medical expertise; and (2) Dr.

27  Ohmoto had submitted a letter in July 2013 that was exclusively the product of Eckert's self-
    report.  *See* AR at 26.  Because these reasons are irrelevant to Dr. Ohmoto's medical opinion

28  regarding Eckert's physical impairments and symptoms as stated in his treatment notes and the
    questionnaire, the Court need not address them.

United States District Court
Northern District of California

1   Court agrees—none of the ALJ's reasons for rejecting that testimony are convincing.[5]

2          In determining that Eckert's testimony was not credible, the ALJ concluded that her

3   "medically determinable impairments could reasonably be expected to cause some of the alleged

4   symptoms; however, the claimant's statements concerning the intensity, persistence and limiting

5   effects of these symptoms are not entirely credible for the reasons explained in the decision."

6   AR at 27.  However, the ALJ failed to articulate which—if any—symptoms could not reasonably

7   be expected to result from Eckert's medically determinable impairments.  Therefore, the Court

8   finds that the first step of determining Eckert's credibility is met with respect to her physical pain

9   and symptoms.

10          Before turning to the ALJ's three reasons for rejecting Eckert's testimony, the Court notes

11   that the ALJ found Eckert's testimony lacked credibility "regarding her symptoms" and that she

12   "reported an inability to perform all work . . . ."  *Id.* at 26; *see also id.* at 27.  The ALJ's vague,

13   boilerplate description of the testimony that he rejected is improper.  As the Ninth Circuit has

14   held, an ALJ must "'specifically identify the testimony from a claimant she or he finds not to be

15   credible and . . . explain what evidence undermines the testimony.' [Citation.]  That means

16   'general findings are insufficient.' [Citations.]"  *Treichler v. Comm'r of Soc. Sec. Admin.*,

17   775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Holohan*, 246 F.3d at 1208; *Lester v. Chater*, 81

18   F.3d 821, 834 (9th Cir. 1995)) (brackets omitted).  Regardless, the ALJ's reasons for rejecting

19   Eckert's testimony are erroneous.

20          The ALJ asserts that Eckert was capable of engaging in a variety of activities while sitting,

21   including out of state travel.  *See* AR at 27.  On this point, *Garrison* is instructive.  There, the

22   Ninth Circuit described two errors committed by an ALJ in determining a claimant's credibility:

23   (1) mischaracterizing testimony; and (2) finding that the physical activities, if performed as they

24

25   [5] The Commissioner has argued that Eckert has failed to address "a majority" of the ALJ's
    credibility findings and, as a result, she has conceded their legal sufficiency.  *See* Opp'n at 9.  This
26   argument misconstrues Eckert's brief, within which she clearly addressed each of the ALJ's
    reasons for rejecting her testimony regarding her physical pain and symptoms.  *See* Mot. at 18–21.
27   The Commissioner is correct to the extent that Eckert did not address the ALJ's credibility finding
    regarding her mental health symptoms.  However, as the Court has found that Eckert's alleged
28   mental health impairments are irrelevant to the determination of her physical disability, the ALJ's
    credibility determinations regarding Eckert's mental health need not be considered.

United States District Court
Northern District of California

had been described in the claimant's testimony, were inconsistent with the alleged pain.  *Garrison*, 759 F.3d at 1015–16.

Here, the ALJ's reasoning contains those same errors.  The ALJ improperly ignored aspects of Eckert's testimony, specifically that she needed frequent rest that caused hours-long naps.  *See* AR at 104–05.  The ALJ also overstated the few sedentary physical activities that Eckert testified to occasionally performing.  *See id.*  The ALJ further erred by finding that Eckert's sedentary activities, if performed as she had described them, demonstrated her capacity to work. *See id.* at 26–27.  An ALJ must be cautious when making such conclusions "because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."  *Garrison*, 759 F.3d at 1016 (citing *Smolen*, 80 F.3d at 1287 n. 7; *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Traveling once or twice by plane and performing some common household chores while frequently sitting and napping does not demonstrate a degree of inconsistency that convincingly establishes that Eckert could work on a daily basis.  Likewise, those activities fail to demonstrate that Eckert's testimony regarding pain and symptoms was not credible.

Second, the ALJ reasoned that Eckert had failed to comply with her prescribed diabetes treatment and Eckert's health had improved when she had complied.  *See* AR at 27.  Again, the ALJ mischaracterized Eckert's testimony.  By only stating that "her blood sugars had improved" when she had complied with her diabetes treatment, the ALJ ignored the other symptoms of diabetes to which Eckert had testified: faintness; poor blood circulation; neuropathy; and susceptibility to infections like pneumonia and bronchitis.  *See id.* at 94–97, 106.  Such selectivity—addressing only one among several symptoms of a severe impairment—renders the ALJ's reasoning unconvincing.

Furthermore, the ALJ improperly ignored an important side effect of Eckert's diabetes medication: uncontrolled eating that resulted in drastic, debilitating weight gain.  Specifically, Eckert explained that she was "extremely resistant" to her diabetes medication, and, as a result, she took hundreds of insulin units that caused her to quickly gain approximately 100 pounds.  *Id.* at 102.  Not only does the record corroborate Eckert's testimony regarding her insulin resistance

and concomitant weight gain, but it further establishes that Eckert's morbid obesity exacerbated the severity of some of her other impairments, symptoms, and pain. *See id.* at 428, 434, 437, 671–72, 698, 727. As a result, the record contradicts rather than substantiates the ALJ's reasoning.

The ALJ's final reason pertained to Eckert's pain medication, which he regarded as evidence that her back and joint pain were not disabling. *See id.* at 27. Although the ALJ is correct that Eckert treated her pain exclusively with over-the-counter medication, the record does not demonstrate that the medication actually relieved her pain. To the contrary, the record establishes that Eckert was intolerant, allergic, or physically incapable of taking stronger medication. *See id.* at 415, 600, 698, 728. Other than the absence of other pain medication, there is no evidence that Eckert overstated the magnitude of her pain. Rather, Eckert's testimony that she suffered from constant, moderately severe pain was corroborated by Dr. Ohmoto, who stated that her "pain [was] not well controlled due to intolerance to typical pain medications." *See id.* at 92–93, 698. In sum, the ALJ failed to provide a clear or convincing reason establishing that Eckert lacked credibility.

### D.   The Erroneously Rejected Evidence Must Be Credited as True

Eckert contends that her testimony and her treating doctors' medical opinion evidence must be credited as true. Mot. at 21. If an ALJ has improperly failed to credit medical opinion evidence or claimant testimony, a district court must credit that evidence as true and remand for an award of benefits provided that three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1019–20; *see also Treichler*, 775 F.3d 1090, 1100–01. Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See Garrison*, 759 F.3d at 1019–21.

The "credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and

1    uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as

2    well as severe economic hardship." *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human*

3    *Servs.*, 859 F.2d 1396, 1398–99 (9th Cir.1988)).   A court may remand for further proceedings

4    "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled

5    within the meaning of the Social Security Act." *Id.* at 1021.   A court may also remand for the

6    limited purpose of determining when a claimant's disability began if that date is not clear from the

7    credited-as-true opinion.  *See House v. Colvin*, 583 F. App'x 628, 629 (9th Cir. July 14, 2014)

8    (citing, *inter alia*, *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010)).   Outside of those

9    circumstances, remand for further proceedings is an abuse of discretion if the credit-as-true rule

10   establishes that a claimant is disabled.  *Garrison*, 759 F.3d at 1020.   Under the three-part test

11   prescribed by the Ninth Circuit, the Court finds that remand with instructions that the

12   Administration award Eckert benefits is appropriate.

13       As explained above, the ALJ failed to provide legally sufficient reasons for rejecting

14   Eckert's testimony and the opinions of her treating doctors.   Thus, the second *Garrison* factor is

15   satisfied.  *See Garrison*, 759 F.3d at 1022.

16       The record has also been fully developed, which the Commissioner does not contest.

17   *See Garrison*, 759 F.3d at 1019–20.  However, the Commissioner contends that evidence in the

18   record suggests that Eckert is not disabled. Opp'n at 10.   In support of this contention, the

19   Commissioner asserts that physical examinations conducted by Dr. Qadir frequently yielded

20   normal results, Eckert's symptoms were adequately controlled by conservative treatment, and Dr.

21   Amusa testified that Eckert could work.  *Id.*  The Court is not persuaded.

22       As described above, the suggestion that conservative treatment sufficiently addressed

23   Eckert's back pain and diabetes is rebutted by the record.   Furthermore, the Commissioner's

24   general reliance on *normal results* misconstrues the process by which the Administration

25   determines disability: the question is whether one or a combination of Eckert's severe impairments

26   prevents her from performing sedentary work.  *See Benecke v. Barnhart*, 379 F.3d 587, 595

27   (9th Cir. 2004); 20 C.F.R. § 404.1520(a)(4).

28       Upon crediting medical opinion evidence and Eckert's testimony as true, the record

United States District Court
Northern District of California

37

demonstrates that there is no uncertainty as to resolution of Eckert's claim. *See Treichler*, 775 F.3d at 1101. The record establishes that Eckert suffers from the severe impairments related to her spine, asthma, diabetes, and morbid obesity. Among the many symptoms caused by those interrelated impairments are severe pain, respiratory infections, and fatigue. Eckert's impairments and symptoms inhibit her ability to work in any capacity. Dr. Qadir expressly opined that Eckert was disabled. Furthermore, Drs. Qadir and Tevrizian both opined that Eckert's impairments would cause her to be absent from work at least twice each month. *See id.* at 676, 696. The VE testified that two or more unscheduled monthly absences would prevent a person with Eckert's RFC from maintaining employment. *See id.* at 127. Thus, the ALJ would be required to find Eckert disabled on remand. *See Garrison*, 759 F.3d at 1022–23. The first and third *Garrison* factors are therefore satisfied and a remand for a calculation and award of benefits is required. *See id.*

## IV.      CONCLUSION

For the reasons stated above, the Court GRANTS Eckert's Motion for Summary Judgment, REVERSES the Commissioner's decision, and REMANDS the case to the Commissioner for the calculation and award of benefits consistent with this order.

**IT IS SO ORDERED.**

Dated: December 13, 2016.

_____
JOSEPH C. SPERO
Chief Magistrate Judge